Filed 9/4/24  Midcoast ECO v. Cal. Coastal Commission CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| MIDCOAST ECO,<br><br>        Plaintiff and Appellant,<br>v.<br>CALIFORNIA COASTAL COMMISSION,<br><br>        Defendant and Respondent;<br><br>COUNTY OF SAN MATEO et al.,<br><br>        Real Parties in Interest and Respondents. | A168036<br><br>(San Francisco City & County Super. Ct. No. CPF-21-517430) |

The California Coastal Act of 1976 (Coastal Act; Pub. Resources Code, § 30000 et seq., undesignated statutory references are to this code) is a comprehensive statutory scheme governing coastal land use planning. (§ 30001.5.)  The Coastal Act requires local governments within coastal zones to prepare a local coastal program (LCP), which includes land use plans, zoning ordinances, zoning district maps, and implementing actions within sensitive coastal resource areas.  (§§ 30108.6, 30500.)  Programs and amendments thereto are subject to approval by the California Coastal Commission (the Commission), which assesses whether programs and amendments conform to Coastal Act policies.  (§ 30510.)  When reviewing amendments, the Commission is exempt from certain requirements imposed

1

by the California Environmental Quality Act (CEQA), e.g., preparing initial studies and environmental impact reports. (§ 21080.5; Cal. Code Regs., tit. 14, § 15251, subd. (f).) But because the Commission must avoid significant adverse effects on the environment where feasible, it prepares a document functionally equivalent to an environmental impact report (EIR) when evaluating the environmental impact of activities, such as a LCP amendment. (Cal. Code Regs., tit. 14, §§ 15250, 15252.) That document must describe the proposed activity and either state the project would not have any significant impacts, or provide alternatives to the activity with mitigation measures to minimize significant adverse environmental impacts. (*Id.* § 15252, subds. (a)(1)–(2).)

The LCP of San Mateo County (the County) previously zoned an 11-acre parcel located in an unincorporated coastal area for the development of 148 homes, with a mix of market rate housing and affordable housing. Later, the County proposed amending its program by rezoning the parcel for only 71 homes, all affordable housing. The Commission certified the amendment, concluding — based on a staff report and the administrative record — the amendment conformed to Coastal Act policies and was not expected to result in any significant environmental effects. In so doing, the Commission did not consider the environmental effects of any specific housing development.

Midcoast ECO (Midcoast) — a nonprofit environmental group — petitioned for a writ of mandate, alleging the Commission violated the Coastal Act by certifying the amendment. It argued the amendment did not conform to the County's LCP or Coastal Act policies of, among other things, protecting, maintaining, and enhancing the quality of the coastal zone environment. Midcoast also alleged the Commission certified the amendment without complying with CEQA's procedural and substantive

2

requirements, such as failing to evaluate reasonably foreseeable environmental effects of the amendment, deferring its environmental review of the specific housing development to a subsequent coastal development permit process, and failing to respond to public comments regarding the amendment. The trial court denied the petition, and Midcoast now appeals. We affirm.

## BACKGROUND

In 1980, the Commission approved the County's LCP, establishing policies to guide development within the County's coastal zone and protect coastal resources. The program authorized planned unit development (PUD) districts that identify specific plans for future development on parcels. The regulations applicable to PUD districts could be different from the adjacent zoning districts with regard to setbacks, height, and other requirements.

As relevant here, the LCP designated an 11-acre parcel in north Moss Beach as a priority site for affordable housing. The parcel is largely undeveloped, located inland of Highway 1, and surrounded by medium density residential development and open space. Montara Creek, a perennial stream located approximately 250 feet to the northeast of the site, runs parallel to the site's northern border and empties into the Pacific Ocean. Vegetation on the parcel consists of mostly grassland, coastal scrub, cypress trees, and pine trees. The site is designated as medium-high density, allowing development at densities from 8.1 to 16 housing units per acre. The parcel's PUD-124 zoning allows construction of 148 units with a density of 13.6 units per acre. The units must be a mix of market rate and affordable housing, with 21 percent of the total units constructed reserved for low-income housing and 14 percent of the total units reserved for moderate-income housing. And by designating affordable housing as an LCP "priority

3

use," public services such as water and sewer are reserved specifically for servicing the development.

In 2018, MidPen Housing Corporation (MidPen) proposed building an affordable housing development, the Cypress Point Family Community (Cypress Point), on the parcel. The development would include 18 two-story buildings holding varying numbers of units each, for a total of 71 housing units — a mix of one-, two-, and three-bedroom units, with a combination of two-story townhouses and Americans with Disabilities Act of 1990-accessible single-level flats. All units, except for the manager's apartment, would be affordable to households earning up to 80 percent of the area median income. Preference for housing would be given to people who currently live or work in the region. The development would include an approximately 3,200 square-foot community building containing, among other things, the general office, manager's office, and community room. The proposed density of the buildings is six and one-half units per acre, significantly below the maximum density allowed by the LCP plan designation. Approximately half of the site would remain undeveloped.

In November 2020, the County sought to amend its LCP to alter the parcel's land use designation from medium-high density to medium density residential. The LCP amendment would also change the County's land use plan to require all development proposals for the site to have 100 percent of units designated for low-income housing — households earning up to 80 percent of the area median income — and allow a smaller, 71-unit project. An implementation plan amendment would rezone the parcel from PUD-124 to PUD-140; eliminate the existing PUD-124 regulations that contained development standards and an associated site plan for a larger, 148-unit project with a minimum of 142 uncovered parking spaces; and replace the

4

regulations with new development standards associated with a smaller project. Those proposed regulations include, among other things, permitted uses, density, height, setbacks, lot coverage, maintenance of 142 uncovered parking spaces, and landscaping.

As part of the LCP amendment development and review process, the County engaged in a land use and coastal analysis, including evaluating habitat issues. The County submitted an amendment package containing technical studies analyzing the potential significant environmental effects of Cypress Point on matters such as air quality and greenhouse gas emissions, biological resources, energy, hazardous materials, quantity and quality of site stormwater runoff, and noise.[1] It also included feasible mitigation measures to reduce the identified effects. The County submitted the amendment, along with the studies, to the Commission for certification that the amendment conformed with the Coastal Act.

After reviewing the local record, as well as information submitted by Midcoast and other public comments, Commission staff prepared a report concluding the amendment and its implementing actions were consistent with both chapter 3 of the Coastal Act — requiring the protection of public access, sensitive habitats, scenic and visual qualities by situating development in a way that avoids and minimizes adverse impacts — and the County's certified land use plan. The report also concluded, as required under CEQA, that the proposed amendment was not expected to result in any

---

[1] A LCP amendment submission must include, among other things, "[a]ll policies, plans, standards, objectives, diagrams, drawings, maps, photographs, and supplementary data, related to the amendment in sufficient detail to allow review for conformity with the requirements of the Coastal Act." (Cal. Code Regs., tit. 14, § 13552, subd. (b).) It must also include any "environmental review documents" pursuant to CEQA, required "for all or any portion of the amendment to the LCP." (*Id*., subd. (e).)

significant environmental effects. The report noted the current LCP included maximum density standards for the parcel that allows more than twice as much development than the proposed amendment. By reducing the density of the parcel, the report explained, the amendment provided increased flexibility to address any potential coastal resource concerns that might arise through the coastal development permit process. For example, it allows for more open space for any necessary resource buffers and landscaping. The Commission subsequently approved the amendment after a March 2021 hearing.

Midcoast filed a combined petition for writ of mandate and a complaint for injunctive relief, alleging the Commission approved the LCP amendment without engaging in the proper level of environmental review under CEQA. Midcoast also alleged the amendment failed to conform to Coastal Act policies protecting coastal resources. It requested the trial court void the approval of the amendment and issue, among other things, a permanent injunction restraining the Commission and the County from processing the approval of the amendment or from beginning construction on Cypress Point. The court denied the writ and dismissed the complaint.

While this appeal was pending, the Legislature added an exemption to CEQA under section 21080.40. (Stats. 2023, ch. 761, § 1, eff. Jan. 1, 2024.) The provision states, in relevant part, that CEQA does not apply to "[r]ezoning, specific plan amendments, or general plan amendments required specifically and exclusively to allow the construction of an affordable housing project." (§ 21080.40, subd. (b)(4).) On March 26, 2024, the County Board of Supervisors passed a resolution approving, among other things, a general plan land use map amendment regarding the Moss Beach parcel changing the land use designation from medium-high density residential to medium

6

density residential.[2] On March 27, 2024, the County filed a notice of exemption with the County's Clerk Recorder stating Cypress Point is an affordable housing project exempt from CEQA under section 21080.40. The County also states it filed the notice of exemption with the State Clearinghouse in the Office of Planning and Research on May 9, 2024.

## DISCUSSION

Midcoast alleges various Coastal Act and CEQA violations in the case before us. Those aggrieved by a Commission's decision may seek judicial review by petitioning for a writ of mandate. (Code Civ. Proc., § 1094.5; Pub. Resources Code, § 30801, subds. (a)–(b).) Courts independently review whether the Commission proceeded in the manner required by law. (*POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 711 (*POET*).) The trial court considers whether the Commission abused its discretion — whether it "has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b); *Ross v. California Coastal Com.* (2011) 199 Cal.App.4th 900, 921 (*Ross*).) In so doing, the court must examine the entire record and consider all relevant evidence, "including that

---

[2] The County asks us to take judicial notice of (1) board of supervisors resolution No. 080239 approving, among other things, a general plan land use map amendment and coastal development permit, for the Cypress Point PUD; (2) a memorandum establishing Cypress Point satisfies the CEQA exemption under section 21080.40; and (3) a notice of exemption. We grant the County's request with regard to the notice of exemption and the resolution. (Evid. Code, § 452, subd. (h) [taking notice of facts not reasonably subject to dispute]; *Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1029, fn. 4, 1053 [judicially noticing documents relevant to the issue of mootness of appeal].) We decline to take judicial notice of the memorandum. The truth of the matters asserted in that document is not subject to judicial notice, and its conclusions are reasonably subject to dispute. (*Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482.)

which detracts from the administrative decision," but the court may not substitute its own findings or inferences for those of the Commission's. (*Id.* at pp. 921–922.) Moreover, the Commission's "findings and actions are presumed to be supported by substantial evidence" — evidence that is reasonable in nature, credible, and of solid value. (*Id.*, at p. 921; *Young v. Gannon* (2002) 97 Cal.App.4th 209, 225.) The party challenging the decision must demonstrate otherwise. (*Ross*, at p. 921.) The scope of review in the trial and appellate courts is the same. (*Ibid.*)

## I.

Midcoast challenges the Commission's determination that the LCP amendment complies with Coastal Act provisions. It argues the Commission failed to evaluate whether the amendment conforms to the Coastal Act's requirements to minimize vehicle miles traveled, protect environmentally sensitive habitat areas, or address hazard containment and cleanup. Midcoast further argues there is insufficient evidence supporting any of the Commission's conformance findings.[3] We disagree.

The Coastal Act, intended to protect and enhance the quality of the coastal zone environment and its natural and man-made resources, governs land use planning in the coastal zone. (§ 30001.5; *Yost v. Thomas* (1984) 36 Cal.3d 561, 565 (*Yost*).) The Commission has chief responsibility for coastal planning and management, ensuring conformity with the Coastal Act. (§§ 30004, subd. (b), 30500, subd. (a); *Security National Guaranty, Inc. v. California Coastal Com.* (2008) 159 Cal.App.4th 402, 420 (*Security National*).) But it is the local government that must prepare LCPs and

---

[3] The Commission and County also contend section 21080.40 renders Midcoast's Coastal Act claims moot, an argument we address when discussing Midcoast's CEQA claims.

8

implementing ordinances to promote the Coastal Act's objectives, thus ensuring responsiveness to local conditions. (§§ 30004, subd. (a), 30500, subd. (a); *Security National*, at p. 420.) The LCP strives to ensure that development within the coastal zone preserves the quality of the environment, as well as its natural and artificial resources. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 571.) LCPs and amendments thereto must be certified by the Commission. (*Security National*, at p. 420; § 30512.)

An LCP consists of two parts: the land use plan and local implementation program. (*Keen v. City of Manhattan Beach* (2022) 77 Cal.App.5th 142, 145.) A land use plan consists of the relevant portions of a local government's general plan indicating "the kinds, location, and intensity of land uses, the applicable resource protection and development policies." (§ 30108.5.) The Commission must certify a land use plan if it meets the requirements of, and is in conformity with, the policies of chapter 3 of the Coastal Act, titled "Coastal Resources Planning and Management Policies." (§§ 30200 et seq., 30512, subd. (c); *City of Chula Vista v. Superior Court* (1982) 133 Cal.App.3d 472, 489 (*Chula Vista*) ["initial planning to be done locally and the final approval to be done by a statewide agency with an eye to statewide policies and limitations"]; *Mountainlands Conservancy, LLC v. California Coastal Com.* (2020) 47 Cal.App.5th 214, 220.) These include specific policies concerning, for example, protection of the marine environment (§§ 30230–30236) and land resources, such as environmentally sensitive habitats (§ 30240). It exercises its independent judgment when reviewing these issues. (*Chula Vista*, at p. 490.) The Commission reviews and certifies LCP amendments in the same manner, with some exceptions not relevant here. (§ 30514, subds. (a)–(c).)

The local implementation program details procedural steps of the land use plan, including zoning ordinances, zoning districts, and other implementing actions. (§ 30108.4; *Security National*, *supra*, 159 Cal.App.4th at p. 420.) The Commission may only reject the implementation plan if it "do[es] not conform with, or [is] inadequate to carry out, the provisions of the certified land use plan." (§§ 30513, subd. (b), 30512, subd. (a); *Ross*, *supra*, 199 Cal.App.4th at p. 928; *Chula Vista*, 133 Cal.App.3d at p. 488 [the Commission "can approve or disapprove but it cannot itself draft any part of the coastal plan"].) The Commission must prepare a staff recommendation, setting forth specific findings including statement of facts and legal conclusions regarding whether the proposed land use plan conforms to the requirements of the Coastal Act. (Cal. Code Regs., tit. 14, § 13532, subd. (a).) The proposed findings must include any additional documentation, governmental actions, or other activity necessary to carry out the Coastal Act requirements. (Cal. Code Regs., tit. 14, § 13532, subd. (a).)

**A.**

Midcoast repeatedly argues the Commission impermissibly deferred a site-specific environmental impact analysis of the LCP amendment to the coastal development permit process. We disagree. Although Midcoast makes this argument as part of its CEQA challenges, it is helpful to first address the issue in a Coastal Act context. That is because the argument improperly conflates the Commission's state-level review of the County's LCP amendment with the *County's* authority to issue a coastal development permit after its project-level review of the development project — a power the Coastal Act expressly delegates to local governments.

Generally, development in the coastal zone cannot occur without

a coastal development permit. (*Spotlight on Coastal Corruption v. Kinsey* (2020) 57 Cal.App.5th 874, 877; § 30600, subd. (a).) The Commission has the ultimate authority to ensure coastal development conforms to Coastal Act policies through the LCP approval process. (*Charles A. Pratt Construction Co., Inc. v. California Coastal Com.* (2008) 162 Cal.App.4th 1068, 1075.) But once the Commission certifies an LCP, its authority over coastal development permits is generally delegated to the local government. (§ 30519, subd. (a).) Hence, the Commission no longer exercises any review authority, aside from appellate review, over new, proposed developments to which the LCP applies. (*Security National*, *supra*, 159 Cal.App.4th at p. 421; § 30519, subd. (a).)

The County may only issue a coastal development permit if the "proposed development is in conformity with the certified local coastal program." (§ 30604, subd. (b).) But it has "discretion to choose what action to take to implement its" program. (*Yost*, *supra*, 36 Cal.3d at pp. 572–573.) For example, the Coastal Act "does not dictate that a local government must build a hotel and conference center—that decision is made by the local government." (*Yost*, at p. 573.) "It merely requires local governments to comply with specific policies—but the decision of whether to build a hotel or whether to designate an area for a park remains with the local government." (*Ibid.*)

Thus, the LCP amendment does not *require* construction of Cypress Point on the Moss Beach parcel, nor does it prohibit alternative projects. Rather, it simply sets forth the parameters for *any* development on the parcel — changing the land use designation from medium-high to medium density residential; requiring any proposals for construction on the parcel be reserved for low-income households; and changing zoning designation for the parcel to PUD-140, adding a design review zoning overlay. In doing so, the

11

amendment primarily precludes the development of a denser project and mandates development of only affordable housing. But the Commission's certification allows the County to approve any potential future project — not simply Cypress Point — that satisfies these standards and conforms to all other applicable LCP policies. (*Yost*, *supra*, 36 Cal.3d at pp. 572–573; Cal. Code Regs., tit. 14, § 13311 [coastal development permit shall be deemed issued when, among other things, findings have been made that the proposed development conforms to the Coastal Act].) Indeed, the amendment prohibits construction on the parcel unless a coastal development permit and other relevant permits have been approved. And the existing LCP requires a coastal development permit for all development in the coastal zone. (Land Use Plan Policy, 1.1.) Any future development depends on a variety of other factors that, after an LCP is certified, are generally beyond the Commission's control.

In sum, the Commission did not impermissibly defer its requisite analysis to a subsequent process.

**B.**

Midcoast contends the Commission failed to consider whether the land use plan portion of the LCP amendment conformed to the Coastal Act's requirement for new developments to minimize vehicle miles traveled. (§ 30253, subd. (d) [new development must, among other things, minimize energy consumption and vehicle miles traveled].) While the Coastal Act fails to define "vehicle miles traveled," CEQA defines the term as "the amount and distance of automobile travel attributable to a project." (Cal. Code Regs., tit. 14, § 15064.3; cf. *Strother v. California Coastal Com.* (2009) 173 Cal.App.4th 873, 879–880 [if there is any inconsistency between the Coastal Act and

12

CEQA, the Coastal Act controls].)  The record reflects the Commission considered whether the amendment would minimize this metric.

The Commission's staff report acknowledged new developments must minimize energy consumption and vehicle miles traveled, thus ensuring new developments in existing developed areas with adequate public facilities and services, such as traffic capacity, do not significantly impact coastal resources.  (§ 30253, subd. (d).)  It emphasized there were traffic deficiencies associated with the *current* LCP on the Moss Beach parcel, especially during commute hours.  Critically, any development on the parcel, even if there were no change to the LCP, could exacerbate those deficiencies.  But the proposed density zoning in the amendment — *medium* density allowing 6.1 to 8 dwelling units per acre — is a reduction from the density authorized under the current LCP — *medium-high* density allowing 8.1 to 16 units per acre.  According to the Commission, the amendment would reduce both the traffic generated, i.e., vehicle miles traveled, and energy consumption generated from any development on that site.  Reasonably inferred, the reduced density in the proposed amended LCP conforms to the Coastal Act's requirement to reduce vehicle miles traveled.  (*Ross*, *supra*, 199 Cal.App.4th at p. 921.)

Comparing the densities and intensities of land use in the LCP with the proposed amendment to determine whether the amendment would minimize vehicle miles traveled under the Coastal Act is not precluded by *Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, despite Midcoast's assertions.  (*Id.* at p. 797.)  Nothing in *Pacific Palisades* — examining whether a project was exempt from the Coastal Act — addresses that point.  Rather, the court simply concluded the mobile home owner's statement that converting the park to residential ownership would have no impact on the density or intensity of land use did

13

not exempt the project from the Coastal Act's jurisdiction. (*Ibid*.) Here, it is undisputed the amendment is subject to the Coastal Act's jurisdiction.

More importantly, reviewing the record, we conclude substantial evidence supports the Commission's finding that the proposed amendment conforms to the Coastal Act's policies regarding vehicle miles traveled. (*Ross*, *supra*, 199 Cal.App.4th at p. 921.) The Commission made this finding primarily by relying on other provisions of the LCP, including that the existing LCP already includes sufficient standards and requirements to ensure traffic impacts are analyzed and mitigated. (*Id*. at p. 928 [construing land use policy provisions and implementation plan provisions in reference to each other to give each effect]; Cal. Code Regs., tit. 14, § 13552, subd. (c) [requiring LCP amendment submission to include a discussion of the amendment's relationship to and effect on the other sections of the already-certified LCP]; Land Use Plan Policy, 3.13.) The program requires the development and implementation of a traffic impact analysis and mitigation plan for new development through the coastal development process. (Land Use Plan Policy, Appendix 1.A, 2.52 ["Prior to the approval of any coastal development permit" application for a new development that generates any net increase of vehicle trips on Highways 1 and/or 92, the development applicant must develop and implement a traffic impact analysis and mitigation plan that includes transportation demand management].) Mitigation measures include transportation demand management, such as establishing a shuttle service, establishing carpools or vanpools, and subsidizing transit for employees of any proposed development. (*Ibid*.) The amendment does not change these requirements, and nothing supports Midcoast's suggestion that the Commission could not consider these

14

requirements when evaluating whether an amendment would minimize vehicle miles traveled.

Moreover, in assessing traffic impacts including vehicle miles traveled, the Commission report noted the County plans for specific transit and roadway improvements — such as improving pedestrian and bicycle routes between the parcel and downtown Moss Beach, and improving existing bus stops — to help provide enhanced traffic flow for both existing and potential development in the area. The plan requires expanded weekend bus service that helps reduce traffic and encourages people to take public transportation.

To the extent Midcoast suggests the Commission disregarded certain benchmarks identified by the California Department of Transportation (Caltrans) for amendments to minimize vehicle miles traveled, this ignores the record. Caltrans' recommended designs encouraging walking, bicycling and transit access were all addressed in the Commission's report. There is no basis to reverse the Commission's decision as a reasonable person could have reached the same conclusion as the Commission, that the LCP amendment is consistent with the Coastal Act policy of minimizing vehicle miles traveled. (*Ross*, *supra*, 199 Cal.App.4th at p. 922 [when reviewing the sufficiency of the evidence, " 'it is for the Commission to weigh the preponderance of conflicting evidence, as [the court] may reverse its decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it.' "].)

## C.

Midcoast contends the Commission failed to determine whether the LCP amendment meets the requirements of, or is in conformity with, Coastal Act policies protecting environmentally sensitive habitat areas. (§ 30240; *Mountainlands Conservancy, LLC v. California Coastal Com.*, *supra*,

15

47 Cal.App.5th at p. 220.) We disagree. The Commission expressly concluded the amendment conformed to both section 30240 and the County's Land Use Plan Policy 7.3 incorporating that Coastal Act provision.

Under the Coastal Act, environmentally sensitive habitat areas must be protected from any significant disruption of habitat values. (§ 30240, subd. (a).) The County's land use plan, like the Coastal Act, defines an environmentally sensitive area as "any area in which plant or animal life or their habitats are either rare or especially valuable" (§ 30107.5; Land Use Plan Policy, 7.1) "because of their special nature or role in an ecosystem" and could "be easily disturbed or degraded by human activities and developments." (§ 30107.5.) The land use plan goes further, identifying specific sensitive habitat areas, including all perennial and intermittent streams as well as sand dunes.[4] (Land Use Plan Policy, 7.1.) Development in areas adjacent to environmentally sensitive habitat areas and parks and recreation areas must be sited and designed to prevent impacts that "significantly degrade those areas." (§ 30240, subd. (b); Land Use Plan Policy, 7.3, subds. (a)–(b).) Indeed, development must be compatible with the continuance of those habitat and recreation areas. (§ 30240, subd. (b).) The County's existing LCP reiterates these requirements, noting that "[a]s part of the development review process," the applicant must "demonstrate

_____

[4] The County's LCP identifies the following as sensitive habitat areas: (1) habitats containing or supporting " 'rare and endangered' " species as defined by the state Department of Fish and Wildlife, (2) all perennial and intermittent streams and their tributaries, (3) coastal tidelands and marshes, (4) coastal and offshore areas containing breeding or nesting sites and coastal areas used by migratory and resident water-associated birds for resting areas and feeding, (5) areas used for scientific study and research concerning fish and wildlife, (6) lakes and ponds and adjacent shore habitat, (7) existing game and wildlife refuges and reserves, and (8) sand dunes. (Land Use Plan Policy, 7.1.)

16

that there will be no significant impact on sensitive habitats." (Land Use Plan Policy, 7.5, subd. (a).) If significant impacts may occur, the applicant is required to prepare a report identifying mitigation measures to protect resources and comply with the sensitive habitat component, as well as a program for monitoring and evaluating the effectiveness of the mitigation measures. (*Ibid.*)

Critically, the Commission concluded the amendment did not present any environmentally sensitive habitat area concerns. The Commission noted the County's existing LCP includes a series of policies to protect coastal resources, as indicated above. Any future development on the parcel would be required to adhere to those policies. In view of those policies, the Commission addressed the relevant issue here — whether anything in the proposed land use policy language, designations, maps, and site plans as applied to the parcel would suggest that a subsequent project might not be capable of protecting coastal resources as required by the Coastal Act, or whether the amendment needed changes or must be rejected. After reviewing those policies, the Commission determined the proposed amendment allows for development that appears consistent with Coastal Act coastal resource protection requirements, where precise details can be readily addressed through a subsequent coastal development permit process.

The record amply supports this determination. Based on a biological resources assessment after searches of online resources and databases — the Department of Fish and Wildlife's California Natural Diversity Database, California Native Plant Society's Inventory of Rare and Endangered Plants, the U.S. Fish and Wildlife Service's endangered and threatened species list — as well as a complete physical survey of the Moss Beach parcel, the parcel is not designated as an environmentally sensitive habitat area.

17

There are no wetland, riparian, or other sensitive habitats on the parcel. Although it is located within the James V. Fitzgerald Area of Special Biological Significance — a broad land designation that appears to cover approximately eight square miles — that area is not an environmentally sensitive habitat area. A project biologist's detailed investigation further revealed no evidence of any rare plant or special status species on the parcel.

The Commission did not impermissibly confine its analysis to sensitive habitat areas located *on the parcel* rather than including adjacent areas, as Midcoast contends. Montara Creek, a perennial stream located approximately 250 feet from the northern border of the parcel is an environmentally sensitive habitat area, but the Commission concluded the proposed amendment did not present any concerns regarding that area. The LCP requires establishment of buffer zones on both sides of the riparian corridors — relevant here, 50 feet outward from perennial streams — and restricting development in those buffer zones. (Land Use Plan Policy, 7.11, subd. (a), 7.12.) As the Commission noted, there is sufficient space on the parcel to provide necessary buffers to protect close sensitive habitats, consistent with the County's Land Use Plan Policy 7.3. The amended implementation plan — requiring any development to substantially conform to those submitted to the County's planning commission — indicates development would not occur on the northern portion of the parcel. And as the Commission concluded, by reducing the development density authorized on the parcel, the land use plan amendment would provide a greater opportunity to concentrate development away from any environmentally sensitive habitat areas as compared to the existing land use plan. Sufficient evidence supports the Commission's conclusion that the amendment

18

conforms to the requirement that any development is designed and sited to prevent impacts to that area. (§ 30240, subd. (b).)

Midcoast nonetheless insists the Commission's analysis is inadequate in several respects. It faults the Commission for failing to expressly address the LCP amendment's conformance with sections 30230 — maintaining and enhancing marine resources to sustain healthy populations of marine organisms — and 30231 — maintaining and restoring biological productivity and coastal estuary and stream quality by minimizing wastewater discharge and controlling runoff. According to Midcoast, the staff report does not expressly address the effects of wastewater discharges or controlling runoff to Montara Creek as a result of the LCP amendment. Moreover, an expert opined that it was reasonably likely a new pump station would be required to adequately remove wastewater from the Cypress Point development, thus significant adverse wastewater impacts must be evaluated before the amendment is approved. Midcoast further argues the report does not consider protection of the terrestrial habitat adjacent to Montara Creek from the erosion of lead-contaminated soils that would be disrupted during construction. Nor did the report address surface water quality that would be impacted during construction and operation of Cypress Point, or chemicals used during construction that could be released into the environment if spilled.

We are not persuaded. First, to the extent the Commission did not expressly recite sections 30230 and 30231 when making its consistency determinations, it nonetheless addressed the relevant resource protection issues, and its findings are supported by substantial evidence. As the staff report emphasized, Coastal Act policies require the protection of sensitive habitats, and any future development on the Moss Beach parcel must meet

19

the County's existing LCP policies protecting coastal resources. Those provisions specifically address stormwater discharges. While there is currently no existing storm drain on the parcel — stormwater runoff percolates on site and excess runoff surface flows toward a street, ultimately discharging to Montara Creek — the appendix to the County's existing LCP includes provisions requiring new developments to protect coastal water quality by specifically identified methods. This includes maximizing on-site infiltration of runoff, and implementing minimum stormwater pollution prevention requirements, such as "[i]mplementing treatment [best management practices] along with site design and source control [best management practices] when the combination of site design and source control" is "not sufficient to protect water quality as required" by the LCP. (Land Use Plan Policy, 1.35, subds. (b), (f) & (k).) Those treatment best management practices are designed to "remove pollutants and/or solids from polluted stormwater runoff." (*Id.*, 1.35, subd. (b).) To the extent any project drains directly to a sensitive habitat, it must implement post-construction treatment best management practices. (*Ibid.*) Additionally, under the County's LCP, "[s]tormwater discharges from new development . . . shall not cause an increase in the erosion potential of the receiving stream over the pre-project" levels. "Increase in runoff flow and volume shall be managed so that post-project runoff shall not exceed estimated pre-project rates and durations, where such increased flow and/or volume is likely to cause increased potential for erosion of creek beds and banks, silt pollutant generated, or other adverse impacts" due to increased erosive force. (Land Use Plan Policy, Appendix 1.A, subd. (4).)

Second, regarding wastewater discharges, the staff report explained the County's land use policies require new development be provided with

20

adequate water supplies and wastewater treatment facilities. It further noted the land use plan requires water and sewer capacity reservations for designated affordable housing sites, such as the Moss Beach parcel. To that end, the Commission explained water and sewer service providers for the parcel — the Montara Water and Sanitary District and Sewer Authority Mid-Coastside — indicated there was enough capacity to serve an affordable housing project at the proposed, reduced density. Indeed, water and sewer capacity had already been reserved to serve the parcel under the County's existing LCP. A reduction in density thus potentially frees up more water already reserved for other Coastal Act or LCP priority uses.

Finally, for protection against erosion of lead-contaminated soil during construction, the Commission explained the County's existing LCP requires all new developments to comply with certain minimum requirements, including cleaning up leaks and spills to prevent groundwater contamination and discharge into the storm drain system, as well as employing site planning and construction methods to reduce the need for pesticides and contaminants, and prevent contact with stormwater. (Land Use Plan Policy, Appendix 1.A (1), subds. (e), (g).) Any stormwater discharges from new development projects "shall not cause an increase in the erosion potential of the receiving stream over the pre-project (existing) condition." (*Id*., Appendix 1.A (4).) Nothing in the LCP amendment changes these provisions, and Midcoast does not demonstrate otherwise. (*Ross*, *supra*, 199 Cal.App.4th at p. 921.)

## D.

We also reject Midcoast's argument that the Commission did not consider the LCP amendment's conformance with Coastal Act policies regarding hazard containment and cleanup with marine resources.

21

Section 30232 provides, in relevant part, "Protection against the spillage of crude oil, gas, petroleum products, or hazardous substances shall be provided in relation to any development or transportation of *such materials*." (§ 30232, italics added.) The Commission acknowledged MidPen's preliminary environmental evaluation analyzed the impacts of hazardous materials on the Moss Beach parcel related to transport and use of hazardous materials during construction of a future housing development. That report identified proposed mitigation measures to address such impacts, including preparation of a site plan prior to submitting a coastal development permit application with required best management practices for construction. But the Commission noted any development on the Moss Beach parcel must incorporate the typical measures applicable to address hazardous materials on site and their potential for impacts to coastal resources. The Commission expressly stated the proposed amendment "does not present hazard concerns necessitating changes to it or denial and can be found consistent with Coastal Act and [LCP] hazardous material requirements."

That determination is supported by the record. The County's existing LCP includes mandatory policies requiring all new development to address contamination. (Land Use Plan Policy, 1.35, subd. (e).) Specifically, all new land use development shall protect coastal water quality by "[m]inimizing the introduction of pollutants into coastal waters (including the ocean, estuaries, wetlands, rivers, streams, and lakes)." (*Ibid*.) All new developments must comply with additional requirements, such as cleaning up leaks and spills immediately to prevent soil contamination. (Land Use Plan Policy, Appendix 1.A (1)(e).) Again, nothing in the amendment allows for future development that avoids or fails to mitigate potential impacts from the presence of

22

hazardous soils, nor does Midcoast identify any.  There was no procedural error, and none of Midcoast's assertions persuade us otherwise.

In sum, the record demonstrates the Commission did not abuse its discretion under the Coastal Act in concluding the LCP amendment is consistent with Coastal Act policies — it proceeded in the manner required by law and its decision is supported by the evidence.  (*Ross*, *supra*, 199 Cal.App.4th at p. 921.)

## II.

Midcoast contends the Commission's CEQA review of the proposed LCP amendment suffers from multiple deficiencies — that it failed to analyze the amendment's reasonably foreseeable environmental impacts, mitigation measures, and project alternatives, and failed to find the amendment had no significant environmental effect.  In supplemental briefing, the Commission and the County argue section 21080.40 renders these claims moot.  We reject both arguments.

"CEQA is a comprehensive scheme designed to provide long-term protection to the environment."  (*Mountain Lion Foundation v. Fish & Game Com.* (1997)16 Cal.4th 105, 112.)  Public agencies must refrain from approving projects with significant environmental effects on the environment — "a substantial, or potentially substantial, adverse change in any physical conditions within the area affected by the project" including land, water, flora, and fauna — if "there are feasible alternatives or mitigation measures that can substantially lessen or avoid those effects." (Cal. Code Regs., tit. 14, § 15382; *City of Arcadia v. State Water Resources Control Bd.* (2006) 135 Cal.App.4th 1392, 1421.)

Generally, before engaging in projects that may have a significant effect on the environment, state and local governments must submit EIRs,

detailing the proposed project's likely environmental impacts, methods to minimize those impacts, and alternatives to the proposed project. (*Pesticide Action Network North America v. Department of Pesticide Regulation* (2017) 16 Cal.App.5th 224, 238–239 (*Pesticide Action*); *Save Berkeley's Neighborhoods v. Regents of University of California* (2020) 51 Cal.App.5th 226, 235.) But certified regulatory programs,[5] such as the Commission's program for approving LCPs, are exempt from this requirement. (*Santa Barbara County Flower & Nursery Growers Assn. v. County of Santa Barbara* (2004) 121 Cal.App.4th 864, 872; *Ross, supra,* 199 Cal.App.4th at pp. 930, 935; § 21080.5, subd. (d); Cal. Code Regs., tit. 14, § 15251, subd. (f).) Instead, certified regulatory programs may submit a substitute document — here, the Commission's staff report — that includes a description of the proposed action with alternatives to the action, and mitigation measures to minimize any significant adverse effect the activity has on the environment. (§ 21080.5, subd. (d)(3)(A); *Friends, Artists & Neighbors of Elkhorn Slough v. California Coastal Com.* (2021) 72 Cal.App.5th 666, 694; *San Joaquin River*

---

[5] "To qualify for such certification, the regulatory program must be governed by rules and regulations that: (1) require that an activity will not be approved or adopted as proposed if there are feasible alternatives or feasible mitigation measures available that would substantially lessen any significant adverse impact the activity might have on the environment (§ 21080.5, subd. (d)(2)(i)); (2) that include guidelines for the preparation of the project plan and for an evaluation of the proposed activity 'in a manner consistent with the environmental protection purposes of the regulatory program' (§ 21080.5, subd. (d)(2)(ii)); (3) that require the administering agency to 'consult with all public agencies which have jurisdiction, by law, with respect to the proposed activity' (§ 21080.5, subd. (d)(2)(iii)); and (4) that require that 'final action on the proposed activity include the written responses of the issuing authority to significant environmental points raised during the evaluation process.' (§ 21080.5, subd. (d)(2)(iv).)" (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1230.)

*Exchange Contractors Water Authority v. State Water Resources Control Bd.*
(2010) 183 Cal.App.4th 1110, 1125–1126.)

If the Commission concludes the project would not have a significant or potentially significant effect on the environment, the Commission must state there are no alternatives or mitigation measures proposed to avoid or reduce any significant effects. (Cal. Code Regs., tit. 14, § 15252, subd. (a)(2).) The statement must be supported by documentation to show the possible effects the agency examined in reaching this conclusion. (*Ibid*.) The agency's final action on the proposed activity must include written responses of the issuing authority regarding significant environmental points raised during the evaluation process. (§ 21080.5, subd. (d)(2)(D).) Although certified regulatory programs are not required to prepare an EIR, they remain subject to CEQA's broad policies of avoiding significant adverse effects on the environment where feasible. (Cal. Code Regs., tit. 14, § 15250.)

We review the agency's action, not the trial court decision, for a prejudicial abuse of discretion. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426–427.) An agency abuses its discretion under CEQA in two ways — by failing to proceed in accordance with CEQA, or by reaching factual conclusions that are unsupported by substantial evidence. (*Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 935 (*Banning Ranch*).) Whether the agency employed the correct procedures is reviewed de novo. (*Citizens of Goleta Valley v. Board of Supervisors*, *supra*, 52 Cal.3d at p. 564; *Banning Ranch*, at p. 935.) Violations of CEQA's procedural requirements are prejudicial if they deprive "the public and decision makers of substantial relevant information about the project's likely adverse impacts." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013)

25

57 Cal.4th 439, 463.) But we review the agency's factual conclusions for substantial evidence. (*Banning Ranch*, at p. 935.) In doing so, we do not substitute our judgment, even if an opposite conclusion would have been equally or more reasonable. (*Ibid*.) And we do not weigh conflicting evidence in disputes regarding whether there are adverse effects on the environment or whether those effects could be better mitigated. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 (*Laurel Heights*).) We set aside the Commission's decision only if the petitioner demonstrates the agency's failure to follow the law is prejudicial, or the failure is presumptively prejudicial, such as when the Commission fails to comply with mandatory procedures. (*Sierra Club v. State Bd. of Forestry*, *supra*, 7 Cal.4th at p. 1236.) We address each of the parties' arguments in turn.

## A.

The Commission argues section 21080.40 exempts the approval of the proposed LCP amendment from CEQA. According to the Commission, the County filed with the county clerk a notice of exemption stating the general land use map amendment and the coastal development permit for Cypress Point are exempt from CEQA under that provision. That determination, which has not been challenged, is now final and not subject to further review. (§ 21167, subd. (d) [requiring an action or proceeding alleging a public agency improperly determined a project is not subject to CEQA must be commenced within 35 days from the date of filing].) As a result, the Commission argues, Midcoast's CEQA and Coastal Act claims are moot. We disagree.

A project may be exempt from CEQA as a matter of statute. (§ 21080, subd. (b).) " 'If a public agency properly finds that a project is exempt from CEQA, no further environmental review is necessary.' " (*CREED-21 v. City*

*of San Diego* (2015) 234 Cal.App.4th 488, 501.)  The agency must " 'only prepare and file a notice of exemption.' " (*Ibid*.)  But determining whether the Commission's certification of the LCP amendment is exempt from CEQA is a matter of statutory interpretation — an issue of law that we review de novo.  (*Make UC a Good Neighbor v. Regents of University of California* (2024) 16 Cal.5th 43, 55.)  We "adopt the construction that best gives effect to the Legislature's intended purpose." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 381.)  The statutory language is the most reliable indicator of legislative intent.  (*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 529.)  We give the words their ordinary meaning, viewing "them in light of the statute as a whole." (*Ibid*.)

The Legislature enacted Assembly Bill No. 1449 (2023–2024 Reg. Sess.), adding section 21080.40.  (Stats. 2023, ch. 761, § 1, eff. Jan. 1, 2024.)  It provides, in relevant part, that CEQA does not apply to the "issuance of an entitlement by a public agency for an affordable housing project" or "[r]ezoning, specific plan amendments, or general plan amendments required specifically and exclusively to allow the construction of an affordable housing project"— "a project consisting of multifamily residential uses only or a mix of multifamily residential and nonresidential uses, with at least two-thirds of the square footage of the project designated for residential use." (§ 21080.40, subds. (a)(1), (b)(1) & (4).)  The affordable housing project must satisfy an array of requirements, including all the residential units within the project, excluding the managers' units, dedicated to lower income households.  (*Id*. subds. (a)(1)(A), (C).)  Critically, if "a *lead agency* determines that an activity is not subject to [CEQA] pursuant to this section and determines to approve or carry out the activity, *the lead agency*

27

shall file a notice of exemption." (*Id.*, subd. (d), italics added.) " 'Lead agency' means the public agency which has the principal responsibility for carrying out or approving a project." (Cal. Code Regs., tit. 14, § 15367.)

Considering section 21080.40 in the context of CEQA's statutory framework, the Commission is the relevant lead agency here. (*Pineda v. Williams-Sonoma Stores, Inc.*, *supra*, 51 Cal.4th at p. 529.) That is, it is the Commission, not the County, that has the burden of complying with CEQA in connection with the County's LCP amendment. (*Ross*, *supra*, 199 Cal.App.4th at p. 940.) Section 21080.9 provides CEQA "shall not apply to activities and approvals *by any local government* . . . as necessary for the preparation and adoption of [an LCP] or long-range land use development plan." (Italics added.) Instead, the *Commission* certifies LCPs — "certification of [an LCP] or long-range land use development plan by the California Coastal Commission" pursuant to the statutes governing LCPs, "shall be subject to the requirements" of CEQA. (§ 21080.9.) While an LCP may be amended by a local government, no such amendment "shall take effect until it has been certified by the commission." (§ 30514, subd. (a).) Once the Commission certifies the LCP, " 'review authority for development within that portion of the coastal zone passes to the local government.' " (*McAllister v. County of Monterey* (2007) 147 Cal.App.4th 253, 272.) Reading these provisions together, the Commission — the public agency with principal responsibility for approving an LCP amendment — must determine whether the proposed amendment is exempt from CEQA under section 21080.40 and, if so, must file the notice of exemption in the relevant public offices.

That did not occur here. While the County filed a notice of exemption stating its consideration of a general plan land use map amendment and coastal development permit are exempt under section 21080.40, the County is not the "lead agency" charged with determining whether the LCP amendment is exempt. (§ 21080.40, subd. (d).) In the absence of any notice of exemption filed by the Commission, its certification of the proposed LCP amendment — the relevant issue before the court — is not exempt under section 21080.40.

The Commission and County do not address this issue in their briefing. Rather, they argue the County's issuance of the coastal development permit for Cypress Point and the County's subsequent filing of its notice of exemption moots Midcoast's CEQA claims as well as its Coastal Act claims. Not so. A "case is moot when the decision of the reviewing court 'can have no practical impact or provide the parties effectual relief.'" (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 214.) As a preliminary matter, the Commission and County fail to identify any support for their argument that approval of the coastal development permit for Cypress Point moots Midcoast's Coastal Act claims. Indeed, the County concedes the text of section 21080.40 does not exempt LCP amendments from the Coastal Act.

More importantly, their argument ignores the process for approving development in coastal zones. Absent an exemption, the Commission's certification of a county's LCP amendment is subject to CEQA; review authority for development passes to the county only once (and if) the Commission has certified the LCP amendment or project. (§ 21080.9; *McAllister v. County of Monterey, supra*, 147 Cal.App.4th at p. 272.) Filing

29

a notice of exemption for the coastal development permit does not necessarily preclude us from providing Midcoast with any effectual relief. While a project "may be complete"— e.g., a certain project has already been built — "mitigation measures could still be imposed to reduce or avoid the significant environmental impacts alleged in the petition," such as requiring a party to engage in proactive lead removal or limiting hours of use of the property. (*Vichy Springs Resort, Inc. v. City of Ukiah* (2024) 101 Cal.App.5th 46, 56.) Thus, even though the County has already approved a coastal development permit for Cypress Point, we could still order the Commission to impose or consider mitigation measures or other alternatives before certifying the proposed LCP amendment.

In sum, Midcoast's CEQA claims are not moot.[6] Hence, we reach the merits of its CEQA claims.

### B.

Midcoast contends the Commission procedurally erred under CEQA by failing to analyze the reasonably foreseeable environmental impacts of future development resulting from the LCP amendment. It further contends the Commission improperly deferred that analysis to the coastal development permit process. After reviewing the issue de novo, we disagree. (*Banning Ranch*, *supra*, 2 Cal.5th at p. 935 [de novo standard of review for issues of omitting essential information from an environmental review document, a procedural issue].)

Environmental reports "should be prepared as early as feasible in the planning process to enable environmental considerations to influence project

---

[6] We express no opinion about whether section 21080.40 exempts from CEQA the issuance of a coastal development permit for the development of Cypress Point.

program and design and yet late enough to provide meaningful information for environmental assessment." (Cal. Code Regs., tit. 14, § 15004, subd. (b).) Possible future development need only be considered in the Commission's environmental impact analysis if it is "reasonably foreseeable" and "will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 396.) But considering the environmental impacts of a possible future development subject to its own review is unnecessary when evaluating the impacts of the project at issue. (*Ibid.* ["if the future action is not considered at [the] time [of the initial project], it will have to be discussed in a subsequent EIR before the future action can be approved under CEQA"].)

Because the LCP amendment proposed changes to the County's land use plan, the Commission's staff report contains an adequate and appropriately abbreviated analysis of the amendment's reasonably foreseeable impacts regarding the type of development authorized by the amendment. "CEQA recognizes that environmental studies in connection with amendments to a general plan will be, on balance, general." (*Schaeffer Land Trust v. San Jose City Council* (1989) 215 Cal.App.3d 612, 625 (*Schaeffer*); *Chula Vista, supra,* 133 Cal.App.3d at p. 487 [LCP documents "serve essentially the same function as a general plan"]; see also § 30108.5 [a land use plan is a portion of a local government's general plan].) An environmental review of " 'a project such as the adoption or amendment of a comprehensive zoning ordinance or a local general plan should focus on the secondary effects that can be expected to follow from the adoption, or amendment.' " (*Schaeffer*, at p. 625.) But there is no requirement that the environmental document be as detailed as one that is required for a specific construction project. (*Ibid.* [authorizing a city to adopt a negative declaration

31

if it perceives no substantial evidence that a project may cause a significant effect on the environment where project was not at the development stage and declaration makes clear *specific development* requires future environmental review].)  Indeed, the level of specificity in an environmental document will correspond to the level of specificity of the underlying activity being assessed.  (Cal. Code Regs., tit. 14, § 15146.)

The report discussed relevant coastal resource issues with the LCP amendment, specifically its analysis of the amendment's conformity with Coastal Act policies.  The Commission considered the potential effects of the LCP amendment on traffic and circulation, public services, fire hazard response, hazardous materials, visual resources, community character, and biological resources.  Among other things, it relied on the County's thorough land use and coastal resource analysis as part of its LCP amendment development and review process, which included evaluating habitat issues and site stability and safety.  The Commission's evaluation was further informed by MidPen's environmental assessment of Cypress Point, which included reports evaluating, among other things, the impacts of a development on the aesthetics and visual resources, the emission of greenhouse gases during the construction and operation, biological resources including species and habitats, use of energy of an affordable housing development and its compliance with energy efficiency regulations, hazardous materials, traffic and transportation facilities and services, as well as reports analyzing cumulative impacts of potential development projects. (*City of Antioch v. City Council* (1986) 187 Cal.App.3d 1325, 1337 [agency only has the responsibility to evaluate and consider "most probable development patterns"].)

After examining these issues, the Commission concluded "the evidence in the record shows that the site appears capable of accommodating a residential use at the intensity and density identified by the LCP amendment without significant coastal resource impacts, individual or cumulative." Accordingly, approval of the proposed LCP amendment was not expected to result in any significant environmental effects — a conclusion the Commission supported with documentation demonstrating the possible effects it examined in reaching this conclusion. (Cal. Code Regs., tit. 14, § 15252, subd. (a)(2).) There is no merit to Midcoast's assertion that the Commission procedurally erred by failing to assess the LCP amendment's reasonably foreseeable impacts. (Compare with *Banning Ranch*, *supra*, 2 Cal.5th at pp. 924, 927 [city violated CEQA because its EIR failed to consider *any* potential and already-identified environmentally sensitive habitat areas on a site before, as the lead agency, it approved a development project].)

To the extent Midcoast, relying on *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116 and *Friends of the Sierra Railroad v. Tuolumne Park & Recreation Dist.* (2007) 147 Cal.App.4th 643, argues the Commission's decision enables future development, thus triggering CEQA review of any planned development before it could approve the amendment, that argument is unfounded. Those cases simply address whether a particular action constitutes a "project" triggering CEQA review before it can be approved. (*Save Tara*, at p. 122 [conditional agreement for private development on property site constituted an approval of a project requiring preparation of an EIR before project approval]; *Friends of the Sierra Railroad*, at pp. 654, 656, 664 [transfer of property was not a project under CEQA that required an EIR].) Here, there is no dispute that the project before the Commission was

33

the LCP amendment, not Cypress Point.  And as set forth above, the Commission engaged in the requisite CEQA review before approving the amendment.

We further reject Midcoast's assertion that the Commission's CEQA review was incomplete because it deferred a more site-specific analysis of Cypress Point's environmental impacts to a later environmental review during the coastal development permit process.  As previously discussed, although the proposed LCP amendment was being driven by the potential development of Cypress Point, the Commission did not have an independent duty to consider that specific development's environmental impact.  The amendment does not foreclose the development of a different project on the same parcel.  The LCP amendment only defines the maximum development parameters for the Moss Beach parcel, expressly stating "[a]ll development shall *substantially* conform to the plans presented to the San Mateo County Planning Commission."  (Italics added.)  The Commission acknowledged the LCP amendment "is intended to facilitate the development of *a* 100% affordable housing project" that meets specific requirements related to a smaller development project than the one authorized under the County's current LCP.  (Italics added; *Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1396–1397 [use of indefinite articles such as "any and all" signals a general reference, while use of a definite article, such as "the" or "these" refers to a specific place or thing].)  Thus, the Commission considered the reasonably foreseeable impacts to the site and surrounding environment due to the amendment, including those associated with the *type* of development that the amendment would allow — those attributable to the proposed zone change and implementation plan.

Moreover, the Commission was not the lead agency for carrying out or approving a specific development project like Cypress Point. (Compare with *Banning Ranch*, *supra*, 2 Cal.5th at pp. 939, 927 [rejecting city's argument environmentally sensitive habitat areas would be fully considered during permitting phase of a development project since the city, as the lead agency — a public agency with principal responsibility for carrying out or approving a project is responsible for preparing an EIR — "must take a *comprehensive* view in an EIR"].) The Commission thus clarified that "the planning determination here at the [LCP] amendment stage *does not replace* the requirement for a [coastal development permit] at a future date for *any* proposed residential project." (Italics added.) The Commission did not — and could not — fully evaluate all the potential specific environmental effects of Cypress Point, a separate project that, at the time, would be subject to its own environmental review. (*Schaeffer*, *supra*, 215 Cal.App.3d at p. 625; *Laurel Heights*, *supra*, 47 Cal.3d at p. 396.) Indeed, Midcoast's arguments challenging the Commission's actions here sharply contrast with those it made while the County was considering amending its LCP — it previously acknowledged the Commission would not review a precise development plan of the Moss Beach parcel because any plans were merely conceptual.

Relying on *POET*, *supra*, 218 Cal.App.4th 681 — concluding a public agency violates CEQA by approving regulations before considering the requisite environmental review document — Midcoast insists the Commission did not complete an environmental review before project approval. (*POET*, at pp. 725, 727.) Nothing in *POET* compels this conclusion. The Commission staff prepared a detailed staff report analyzing the LCP amendment's conformance with chapter 3 of the Coastal Act, as well as its impact on environmental and coastal resources. It issued the report

35

recommending approval of the LCP amendment on February 26, 2021, and an addendum to the staff report the following month. The Commission then voted to certify the LCP amendment based on the findings in the staff report and accompanying materials. The Commission did not engage in a post hoc rationalization approving the LCP amendment — it approved the amendment after considering its environmental effects as identified in the staff report. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 394.) In sum, the Commission did not err procedurally under CEQA by deferring a more site-specific analysis of Cypress Point's environmental impacts to the coastal development process.

## C.

Midcoast contends the Commission violated CEQA by choosing an improper baseline to evaluate environmental impacts — comparing the LCP amendment's environmental impacts to those resulting from potential development under the existing LCP's zoning rather than the existing environment. We disagree.

The fundamental goal of an environment review document "is to inform decision makers and the public of any significant adverse effects a project is likely to have on the physical environment." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority*, *supra*, 57 Cal.4th at p. 447.) Determining whether a project is likely to have significant environmental effects requires the lead agency to "use some measure of the environment's state absent the project" — a baseline for environmental analysis. (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 315.) Generally, "baseline physical conditions" are "the physical environmental conditions" in the project's vicinity "at the time" before the project is implemented. (Cal. Code Regs.,

36

tit. 14, § 15125, subd. (a).) We review de novo whether the baseline selected by the Commission was consistent with CEQA. (*John R. Lawson Rock & Oil, Inc. v. State Air Resources Bd.* (2018) 20 Cal.App.5th 77, 104.)

The Commission evaluated the LCP amendment's environmental impacts in relation to both a "no-project alternative" and the development permissible under the County's existing zoning and plan designations. This comparison was proper. The purpose of describing and analyzing a no-project alternative "is to allow decisionmakers to compare the impacts of approving the proposed project with the impacts of not approving the proposed project." (Cal. Code Regs., tit. 14, § 15126.6, subd. (e)(1).) The no-project analysis discusses the existing conditions at the time of the environmental analysis as well as those reasonably expected to occur in the foreseeable future if the project is not approved. (*Id.*, subd. (e)(2).) "When the project is a revision of an existing land use or regulatory . . . the 'no project' alternative will be the continuation of the existing plan, policy or operation into the future." (*Id.*, subd. (e)(3).) Critically, the "no project alternative analysis is not the baseline for determining whether the proposed project's environmental impacts may be significant, *unless*" — as is the case here — "it is identical to the existing environmental setting analysis." (*Id.*, subd. (e)(1), italics added.)

Here, the Commission described the environmental setting in a sufficient manner to allow an understanding of the significant effects of proposed projects and their alternatives. (Cal. Code Regs., tit. 14, § 15125, subd. (a).) It noted the Moss Beach parcel as "inland of Highway 1, surrounded by medium density residential development and open space, and largely undeveloped (except for some remnant development from previous buildings and two water tanks)." The parcel connects to Highway 1 approximately 0.1 miles to the north and is approximately one-half mile from

37

Moss Beach's commercial district to the south. Those remnants include slab foundations, "retaining walls, and unpaved internal roadways that are largely overgrown with vegetation." MidPen prepared a report noting the Moss Beach parcel is zoned for residential development and was previously used for military and firefighter training facilities. In its current condition, it does not contain any agricultural or forestry resources, nor is the parcel zoned for mineral extraction or designated as containing any mineral resources of state, regional, or local importance.

The Commission asked MidPen and the County to evaluate alternatives to the proposed LCP amendment. MidPen expressly identified a "No Project (No Build) Alternative," which could be implemented without changing the existing site zoning. In such circumstances, the site would remain in its present, undeveloped condition. (Cal. Code Regs., tit. 14, § 15126.6, subd. (e)(1).) It then compared the impacts of the no-project alternative to the impacts associated with the amendment. Under the no-building alternative, for example, MidPen determined the Moss Beach parcel would not be developed and hence would not have any impacts on biological resources. In contrast, MidPen explained the LCP amendment would have biological impacts — while it would not result in the loss of any protected species, it would potentially disturb nesting raptors on the forested northern portion of the parcel due to construction of a housing development. It did the same for aesthetic and visual resources, cultural resources, energy, environmental justice, geology and soils, and greenhouse emissions, among other things. The Commission staff report expressly relied on these technical and related reports and materials when assessing significant environmental impacts of the LCP amendment. (*Ross*, *supra*, 199 Cal.App.4th at p. 943 [administrative record containing a city's analysis of feasible alternatives to

38

a project demonstrates the Commission considered alternatives to a proposed LCP amendment].)  Thus, the Commission's determination of the impacts of the LCP amendment was consistent and coherent "relative to leaving the land in its existing physical condition."  (*Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 710.)

Midcoast insists the Commission improperly evaluated the environmental impacts of the LCP amendment by using the potential development under the County's present LCP as the baseline.  True, MidPen assessed whether the LCP amendment's impacts would be as significant as those under the existing zoning.  But when a project involves the alteration of a previously adopted plan, an environmental review document must compare the project with " 'existing physical conditions' but should also compare it with 'potential future conditions discussed in the [previously adopted] plan.' "  (*Woodward Park Homeowners Assn., Inc. v. City of Fresno*, *supra*, 150 Cal.App.4th at p. 707.)  The comparison between the project with potential future conditions discussed in a previously adopted plan is important for enabling "the public and decision makers to identify possible inconsistencies between the proposed project and the previously adopted plan."  (*Ibid*.)

Relying on MidPen's evaluations, the Commission performed that analysis here.  MidPen found that allowing the development of a medium-high density housing as authorized under the current LCP would have additional potential impacts to nesting raptors because it would result in the removal of trees.  MidPen engaged in a similar analysis — comparing the impacts of the no-project no-building alternative with those from the existing LCP and the amendment — for other impacts, such as air quality, geology and soils, and hazards and hazardous materials.  Given the analysis of the

39

no-project alternative, as discussed above, using potential future conditions under the existing LCP as a point of comparison was not improper. (*Woodward Park Homeowners Assn., Inc. v. City of Fresno*, *supra*, 150 Cal.App.4th at p. 707.)  The Commission proceeded in the manner required by law by using both baselines for assessing significant environmental effects from the LCP amendment.

### D.

Midcoast challenges the Commission's finding that the proposed LCP amendment is not expected to result in any significant environmental effects. According to Midcoast, the record contains substantial evidence supporting a fair argument the proposed LCP amendment will have several significant impacts on the environment.  Specifically, it contends the Commission relied on various environmental evaluations — the County's LCP amendment resolution, preliminary evaluation, biological assessment, cultural resource, and traffic impact analysis — that constitute substantial evidence the environmental impacts from the amendment *will* be potentially significant. It also argues the Commission failed to support its determination the proposed LCP amendment would not have any significant environmental effect with proper documentation.  We disagree.

We review determinations regarding a potential environmental impact's significance for substantial evidence — "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached."  (Cal. Code Regs., tit. 14, § 15384, subd. (a); *League to Save Lake Tahoe v. County of Placer* (2022) 75 Cal.App.5th 63, 94.)  Agencies have discretion on whether to classify an environmental impact as significant, "depending on the nature of the area affected."  (*W.M. Barr & Co.,*

40

*Inc. v. South Coast Air Quality Management Dist.* (2012) 207 Cal.App.4th 406, 433.) If the agency determines that a project impact is insignificant, the substitute document must contain a brief statement indicating the reasons for that conclusion. (Cal. Code Regs., tit. 14, § 15128.) Midcoast bears the burden of demonstrating with citations to the record the existence of substantial evidence supporting a fair argument of significant environmental impact. (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1379.)

At the outset, and contrary to Midcoast's suggestion, there is no conflict between the environmental impact evaluations relied upon by the Commission — evaluating and identifying significant impacts from developing Cypress Point — and the findings in the Commission's staff report — evaluating and identifying the impacts from the implementation of the proposed LCP amendment. The evaluations regarding potential impacts resulting from a potential Cypress Point development informed the Commission's environmental review of the amendment, but they were not the focal point of the Commission's evaluation. (*Schaeffer*, *supra*, 215 Cal.App.3d at pp. 623, 626–627 [noting a traffic evaluation resulting from development of a golf course may influence that project's program and design, but it does not "describe a specific environmental effect that can be expected to follow from adoption" of an amendment to the city's general plan to add a mixed use to the existing zoning allowing a parcel to be used as an industrial park].) For instance, the evaluations upon which the Commission relied identify several impacts from Cypress Point that "will be mitigated at a subsequent stage of development." (*Id.* at p. 626.) But the evaluations do not "describe a specific environmental effect that can be expected to follow from adoption" of an amendment to the County's LCP. (*Ibid.*) For that reason, the Commission, looking at the amendment and the existing LCP policies, determined the

41

proposed amendment includes "all feasible measures to ensure that potentially significant environmental impacts of new development are minimized to the maximum extent feasible." The mere decision to adopt the amendment "leads [the Commission] not one step closer to an ecological point of no return." (*Ibid*.)

More importantly, Midcoast, citing solely to potential impact determinations in technical reports for the preliminary *Cypress Point* plans, fails to satisfy its burden of identifying all the relevant evidence in the record to demonstrate the absence of substantial evidence supporting the Commission's determination that the proposed *LCP amendment* will not result in significant environmental impacts. (*Citizens' Committee to Complete the Refuge v. City of Newark* (2021) 74 Cal.App.5th 460, 470; *Ross*, *supra*, 199 Cal.App.4th at pp. 921–922.) First, MidPen's traffic impact analyses — identifying seven significant and unavoidable impacts of traffic delays generated at various intersections resulting from Cypress Point — does not sustain Midcoast's burden. As the Commission noted, the Moss Beach parcel in its existing state already has traffic deficiencies. The Commission expressly acknowledged any development on the parcel could exacerbate those deficiencies. But the Commission explained that, on a plan level, the County's existing LCP policies requires the development and implementation of a traffic impact analysis and mitigation plan through the subsequent coastal development permit process.[7] In particular, existing land use plan

---

[7] The Commission noted some mitigation measures could include developing and implementing potential transit and roadway improvements, such as improving pedestrian and bicycle routes between the Moss Beach parcel and downtown Moss Beach and improving existing bus stops — the same recommendations made in MidPen's traffic impact analysis. These would help provide for enhanced traffic flow for both the existing and planned development in the area.

policies mandates new developments to assess and mitigate negative traffic impacts as much as possible. (Land Use Plan Policy, 3.13.) With these existing LCP policies in place, there was no potentially significant environmental impact to traffic. As the Commission noted, these existing LCP policies prohibit any future development to be inconsistent with its policies and protects against adverse coastal resource impacts associated with traffic. Reliance on these provisions in making its determination was appropriate — the Commission was only engaging in a plan-level review of the amendment, not Cypress Point. (*Ross*, at p. 945 [applying various provisions of an LCP to reduce significant adverse effects on visual resources].) Midcoast offers no evidence to suggest it would be unreasonable to expect any future development compliance with these policies.

Midcoast's reliance on an August 2020 biological resource assessment, finding a significant impact to the California red-legged frog from the Cypress Point development similarly fails to satisfy its burden. That biological assessment explained the Moss Beach parcel does not provide the appropriate aquatic habitat necessary for the species, it has not been observed on the parcel, and there are no documented occurrences of the species on the parcel A dense cypress tree habitat along the northern border of the parcel in fact separates the parcel from any appropriate aquatic drainage habitat. According to the assessment, the likelihood of the red-legged frog's presence on the parcel where construction could take place is low given the lack of an aquatic habitat and lack of shaded moist areas — all statements Midcoast ignores. (*Mani Brothers Real Estate Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385, 1402 ["As with all substantial evidence issues, an appellant challenging the evidence must lay out the evidence favorable to the other side and show why it is lacking"].) The

assessment deemed the impact of any development to the species as significant solely if the species migrates over the parcel to the uplands immediately surrounding the aquatic habitat along the northern border of the parcel.  But it emphasized mitigation measures employed during any development, such as standard avoidance, consulting with a biologist, and obtaining regulatory approvals and authorizations from the California Department of Fish and Wildlife.

The Commission's staff report appropriately addressed these findings, noting there have been no documented rare or special status species on the parcel.  To the extent that any subsequently appear or are identified, the Commission explained the County's existing LCP habitat protections would continue to apply to future development proposed at the site through the coastal development permit process to appropriately address any habitat issues, including avoidance and construction best management practices. The record amply supports this conclusion.  For instance, the LCP program requires the applicant for a development, as part of the development review process, to "demonstrate that there will be no significant impact on sensitive habitats." (Land Use Plan Policy, 7.5, subd. (a).)  If it is determined significant impacts may occur, the permit applicant must "provide a report prepared by a qualified professional which provides: (1) mitigation measures which protect resources and comply with the policies of the Shoreline Access, Recreation/Visitor-Serving Facilities and Sensitive Habitats Components, and (2) a program for monitoring and evaluating the effectiveness of mitigation measures." (*Ibid*.)  In addition, there must be "an appropriate program to inspect the adequacy of the applicant's mitigation measures." (*Ibid*.)  Prior to permit issuance, a qualified biologist must prepare a report, among other things, demonstrating any development will not impact the

44

functional capacity of rare and endangered organism habitats and recommending mitigation if development is permitted adjacent to those habitats. (*Id.*, subds. (c)–(d) [sensitive habitats component].) Recommending specific mitigation provisions to address this concern was unnecessary, contrary to Midcoast's assertions. The existing LCP already contained those protective provisions. (*Chula Vista, supra*, 133 Cal.App.3d at p. 488 [Commission "does not create or originate any land use rules and regulations"].) Midcoast makes no effort to refute the above or explain how the record insufficiently supports the Commission's conclusion that any impact to biological resources from the LCP amendment is not significant.

The same is true for Midcoast's reliance on MidPen's preliminary environmental evaluations, indicating development of Cypress Point would have a significant impact from transport and use of hazardous materials during construction. The evaluation stated there were potential impacts to groundwater and surface water quality during construction and operation of Cypress Point. But it recommended development of a site management plan with best management practices and implementing stormwater pollution prevention best management practices as well as erosion control, both of which would reduce these potential impacts to less than significant. Consistent with that finding, the Commission noted that potential impacts from soil could be addressed through the preparation of a site management plan, which would be required during the coastal development permit process for Cypress Point. Indeed, the County's LCP contains various policies governing new development to prevent stormwater pollution — all new development must at minimum comply with the requirements to "[a]void or minimize and mitigate the potential adverse impacts to water quality from new development by using pre-construction, during construction, and post-

45

construction best management practices"; and "[p]revent the flow of liquid building materials and wastes onto impervious surfaces and into storm drains and waterways." (Land Use Plan Policy, Appendix 1.A 1. (a), (b).) Incorporating mitigation measures in the Commission's staff report to address this impact was thus unnecessary.

Midcoast similarly gains no traction by arguing a cultural resource evaluation determined the Cypress Point development would have a significant cultural impact on a Native American archeological deposit. The evaluation explained there is an archeological deposit within a small, well-defined area on the Moss Beach parcel, approximately 80 feet by 30 feet. Radiocarbon analysis of dietary shell fragments found on the parcel revealed the samples dated back to the 1500s to 1600s and 1000s to 1200s. But the survey also revealed materials such as glass, plastic, and metal, and that the parcel has been used as a dumping site for various materials including garbage, rocks, and spoils dirt. Thus, based on historic patterns of grading and construction on the parcel, it is possible that the archeological deposit was simply imported from a nearby archeological site, located on Point Montara approximately 150 feet from the northwest corner of the Moss Beach parcel. It could have also represented a heavily disturbed basal layer of a deeper site removed during historic earthmoving on the property. The evaluation recommended site excavation through an archeological salvage program prior to construction, archeological monitoring during construction through the use of field archeologists, and notifying a project archeologist if any individual artifacts are discovered during earthmoving activities.

The Commission staff report acknowledged these findings, noting there was the potential for subsurface cultural materials to be present in undisturbed portions of the parcel. But according to the Commission, the

46

proposed LCP amendment's reduction in housing development density allows for a greater opportunity to concentrate development away from any significant cultural resources. Moreover, the existing LCP policies regarding cultural resource protection, the Commission explained, would continue to apply to future development to mitigate impacts to cultural resources. Indeed, the County's land use plan requires a determination of "whether or not sites proposed for new development are located within areas containing potential archaeological/paleontological resources." (Land Use Plan Policy, 1.25.) Before any approval of development in such a sensitive area, a qualified archaeologist/paleontologist must prepare and submit for review and approval a mitigation plan, "adequate to protect the resource[s]." (*Ibid*.) Considering these measures that address the existence of cultural resources on the Moss Beach parcel when any such development would occur, the Commission reasonably concluded any impact from the amendment would not be significant.

Consequently, Midcoast fails to demonstrate the existence of substantial evidence supporting a fair argument of the proposed LCP amendment's significant environmental impact. (*Gentry v. City of Murrieta*, *supra*, 36 Cal.App.4th at p. 1379.) An adequate basis supported the Commission's finding of no significant or potentially significant impacts from the amendment.

We also reject Midcoast's unsupported assertion that the Commission abused its discretion by failing to demonstrate how its finding was meaningfully derived. (Cal. Code Regs., tit. 14, § 15252, subd. (a)(2)(B) [requiring a statement that a project would not result in any significant or potentially significant effects on the environment be supported by documentation to show the possible effects the agency examined in reaching

47

the conclusion]; *Pesticide Action, supra,* 16 Cal.App.5th at p. 247.) The Commission expressly made its determination by referencing its prior discussion regarding relevant coastal resource issues. As outlined above, the Commission explained and supported with documentation its reasons for finding that each identified significant environmental impact from developing Cypress Point did not pose an issue to coastal resources. (*Gentry v. City of Murrieta, supra,* 36 Cal.App.4th at p. 1380 [relying on the entire administrative record to support the conclusion a project would not adversely impact a specific environmental issue].) Though lacking organization, the staff report was adequate and complete, demonstrating a good faith effort at fully disclosing the "analytic route [the Commission] traveled from evidence" in the record to its determination. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515; *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 659 [environmental review document should not require public "to sift through obscure minutiae or appendices" to find important components of the analysis].)

### E.

Midcoast contends the Commission violated CEQA because it was required, but failed, to evaluate mitigation measures and feasible alternatives. Not so.

Reviews conducted under a certified regulatory program — as here — require the agency to affirmatively demonstrate that "notwithstanding a project's impact on the environment, the agency's approval of the proposed project followed meaningful consideration of alternatives and mitigation measures." (*Mountain Lion Foundation v. Fish & Game Com., supra,* 16 Cal.4th at p. 134.) But significantly, Midcoast fails to identify the project for which mitigation measures or alternatives should have been evaluated.

48

That omission is critical — mitigation measures and alternatives are only necessary to "avoid or reduce any significant or potentially significant effects that the project might have on the environment." (Cal. Code Regs., tit. 14, § 15252, subd. (a)(2)(A)–(B).) Otherwise, the document used as a substitute for an EIR or negative declaration in a certified program must include a "statement that the agency's review of the project showed that the project would not have any significant or potentially significant effects on the environment and therefore no alternatives or mitigation measures are proposed to avoid or reduce any significant effects on the environment." (*Ibid*; see also *Pesticide Action*, *supra*, 16 Cal.App.5th at p. 245.)

As discussed above, the Commission concluded the project at issue — the proposed LCP amendment — would not have any significant effect on the environment, a finding supported by substantial evidence. The Commission further explained the County's existing certified LCP policies and requirements already ensure impacts of future developments would be mitigated or avoided at the coastal development permit stage, a finding Midcoast does not dispute. Consequently, the Commission proposed no alternatives or mitigation measures to avoid or reduce those effects. This was proper. While Midcoast repeatedly cites to significant environmental effects resulting from the development of Cypress Point, and its attendant proposed mitigation measures and feasible alternatives to the development of Cypress Point, that was not the project before the Commission. We discern no CEQA violation.[8]

_____

[8] In any event, the record reflects the Commission did consider potential alternatives to the proposed amendment. This included MidPen's analysis of alternatives, such as reducing the number of affordable units that would reduce the air quality, energy, greenhouse gas, hydrology and water quality, and transportation and traffic impacts from Cypress Point. Of

**F.**

Midcoast contends the Commission violated CEQA by failing to provide written responses to significant environmental issues raised in public comments regarding the development of Cypress Point — traffic and transportation impacts, biological impacts, wastewater, and hazardous material impacts to the soil on the Moss Beach parcel. We disagree — this argument ignores that the Commission was assessing the environmental impacts of the proposed LCP amendment, not Cypress Point.

Commission staff must respond to significant environmental points raised during the evaluation process of an LCP. (§ 21080.5, subd. (d)(2)(D); Cal. Code Regs., tit. 14, § 13533, subd. (b); *Ross, supra*, 199 Cal.App.4th at p. 940.) Responding to every comment raised is unnecessary — only the most significant questions raised in opposition to the project warrant a response. (*Ebbetts Pass Forest Watch v. Department of Forestry & Fire Protection* (2004) 123 Cal.App.4th 1331, 1356.) Those responses may be included in the staff report. (Cal. Code Regs., tit. 14, §§ 13533, subd. (b), 13552, subd. (a) [LCP amendment submission must include copies or summaries of significant comments received and local government's responses to the comments].) Generally, where the failure to consider public comments frustrates the purpose of the public comment requirement, it is

the four alternatives MidPen assessed — no project, medium density development, reduced number of units, and development under the existing LCP zoning — the no-project alternative had no environmental impacts and the reduced unit alternative either reduced the environmental impacts or had the same impact as compared to the amendment. Yet that alternative compromised on the County's LCP goal of maximizing affordable housing and would be less competitive for financing options compared with Cypress Point. MidPen also considered development on parcels aside from Moss Beach, but noted one had a significant slope that would create technical hurdles to developing the site.

prejudicial error.  (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 487.)  We review de novo this mixed question of law and fact — whether the Commission responded to the public comments with sufficient detail to enable those who did not participate in the preparation of the environmental review document to understand and meaningfully consider issues raised with the proposed LCP amendment.  (*County of Butte v. Department of Water Resources* (2023) 90 Cal.App.5th 147, 159.)

Here, the Commission staff report addressed the public comments regarding Cypress Point globally, properly noting its review is limited to the impacts of the proposed LCP amendment.  It emphasized its assessment does not replace an environmental review for a coastal development permit at a future date for any proposed residential project.  (*Ross*, *supra*, 199 Cal.App.4th at p. 941 [responses to comments regarding the approval of an LCP are not specific as those generated during the coastal development permit process].)  The Commission staff report explained the "proposed amendment does not predetermine an outcome that would allow for a project that does not protect coastal resources as required by the Coastal Act."  Rather, the proposed zoning designations and standards would accommodate a residential development similar to the surrounding, already developed residential neighborhood.  Critically, the Commission noted the County's existing LCP would retain all of its coastal resource protection standards with which any future proposed development project must comply.  (*Id.* at p. 941 [relying on additional LCP provisions to address impacts to view resources in response to public comments].)  We discern no insufficiency in this response.  (*Ebbetts Pass Forest Watch v. Department of Forestry & Fire Protection*, *supra*, 123 Cal.App.4th at p. 1356 [insufficiency of responses to

51

environmental objections may be grounds for issuing a writ of mandate to set aside agency decision].)

Setting aside the legal question of whether CEQA requires the Commission to respond to public comments regarding a potential future project rather than the proposed LCP amendment, the Commission did in fact provide responses to public comments regarding soil impacts, sewage and wastewater discharge, biological impacts, and traffic impacts, as described below.

## 1.

Midcoast argues the Commission failed to respond to comments that the Moss Beach parcel has lead concentrations in the soil exceeding environmental screening levels, the extent of the lead contamination is unknown, and lead testing should be submitted to regulatory agencies. This argument is meritless.

The Commission issued a response referring to a supplemental environmental evaluation report prepared by MidPen and attached as an appendix analyzing the impacts of hazardous materials on the Moss Beach parcel and those related to construction of any future development. (*County of Butte v. Department of Water Resources*, *supra*, 90 Cal.App.5th at p. 182 [petitioner failed to demonstrate CEQA violation where the Department of Water Resources cited a study in the record in response to comments]; *City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 902 [relying on external consultant report attached to environmental review document assessing impacts and mitigation measures in response to public comments] (*Long Beach*).) In that evaluation report, MidPen acknowledged the presence of possible toxic substances in the soil on the parcel. Both the Commission and MidPen note that mitigation measures to address these

52

issues include preparing a site management plan prior to submitting a coastal development permit application with required best management practices for construction. The Commission explained the coastal development permit application requires a more detailed soil analysis and requirements regarding handling potentially contaminated soils during construction, as well as methods to ensure residents, Montara Creek, and the James V. Fitzgerald Marine Reserve are protected from contaminated soils. Additionally, as the Commission noted, any future development on the parcel must incorporate typical measures to address hazardous materials on the site — the same recommendations made by Midcoast's soil expert. Indeed, the LCP amendment does not allow for future development that fails to avoid or mitigate potential impacts from the presence of hazardous soils. Midcoast cannot credibly deny the Commission responded to these public comments.

To the extent Midcoast insists the Commission's response lacked details sufficient to inform the public about specific levels or extent of soil contamination, we disagree. The level of detail in the Commission's response was commensurate to the level of detail of the proposed project — the LCP amendment and the significant environmental impacts that may occur from rezoning the Moss Beach parcel. (*Long Beach*, *supra*, 176 Cal.App.4th at p. 901 ["level of detail required in a response to a comment depends on factors such as the significance of the issues raised, the level of detail of the proposed project, the level of detail of the comment, and the extent to which the matter is already addressed" in, among other things, "responses to other comments"].)[9]

_____

[9] On a related note, it appears comments regarding soil contamination were duplicative of information the Commission already considered. (Cf. *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection*, *supra*, 44 Cal.4th at p. 488 [no prejudicial error where any

**2.**

Similarly, the Commission adequately responded to public comments regarding sewage.  According to an expert presented by Midcoast, Cypress Point's wastewater impacts must consider the local sewage system's history of discharges of inadequately treated or raw sewage, releasing raw sewage into the Pacific Ocean and Half Moon Bay.  The expert also noted that it is reasonably likely a new pump station would be needed for Cypress Point to adequately remove wastewater to a neighboring sewage conveyance system, and an improperly designed station could result in sewage spills.  As a preliminary matter, the Commission's response — the existing LCP requires adequate sewer capacity be set aside to serve a higher density residential development — appropriately focused on the proposed LCP amendment, not Cypress Point.  (*Long Beach*, *supra*, 176 Cal.App.4th at pp. 901–902 ["level of detail required in a response to a comment depends on factors such as . . . the level of detail of the proposed project"].)

---

agency omits responses to public comments that were duplicative of information an agency already considered].)  A MidPen consultant determined the lead concentrations in one sample of the soil on the Moss Beach parcel exceeded levels for residential land use.  A statistical analysis of the soil was performed to establish site-wide background concentration for lead and to evaluate its potential human health risk in shallow soils.  The consultant recommended as a precautionary measure the development of a site management plan to address potential environmental conditions that may be encountered during future development.  The site management plan would provide certain health and safety plans, such as guidelines for sampling and managing impacted or potentially impacted soils, and notification for appropriate regulatory agencies during site development.  The consultant prepared the report for the County's use, which was subsequently relied upon by the Commission in making its determination regarding certifying the LCP amendment.

54

Moreover, as the Commission noted, the Sewer Authority Mid-Coastside represented the wastewater treatment system has adequate capacity for growth particularly for residential development on the Moss Beach parcel.  Again citing MidPen's environmental report, the Commission explained evidence in the record demonstrated development on the Moss Beach parcel at the scale presented in the proposed LCP amendment could be accommodated without resulting in significant impacts to coastal resources. (*Environmental Protection Information Center, Inc. v. Johnson* (1985) 170 Cal.App.3d 604, 628 [responses supported by scientific authorities or explanation may be sufficient to satisfy the requirement for providing a meaningful, reasoned response to public comments].)

That report noted there are no specific utility plans for sewer pipelines for development on the Moss Beach parcel — "project details will be more fully developed upon receipt of utility plans."  But any construction of sewer system improvements would be routed to provide setbacks between new facilities and existing water and wastewater pipelines, and to avoid other existing utilities.  And implementation of the proposed improvements and sewer connection will be required to comply with the County's ordinances as well as the Montara Water and Sanitary District Code, both of which would reduce potential secondary impacts.  (*Ross, supra,* 199 Cal.App.4th at p. 941 [no violation of CEQA content requirements during LCP amendment process where report responded to comments by noting mitigation measures would be imposed on the subject parcel].)  Moreover, because the Moss Beach parcel has been designated a priority land use, wastewater service capacity has been reserved under the existing LCP.  And Montara Water and Sanitary District, the entity servicing the parcel, continually maintains the sanitary sewer system, some of these maintenance improvements could support sewer

collection for any future development. The Commission's responses appropriately "contain a brief, accurate description of the issue raised" — acknowledging comments regarding adequate sewer capacity, need for a sewage pump station, the potential for spills, and exacerbating existing sewage problems — and set forth detailed reasons for rejecting the particular comments. (*Ebbetts Pass Forest Watch v. Department of Forestry & Fire Protection*, *supra*, 123 Cal.App.4th at p. 1357.)

Midcoast nonetheless argues the Commission failed to address comments regarding past discharges of raw sewage. The staff report indicates otherwise. The Commission noted "[w]ith regard to the potential for impacts from future project-related sewage overflows, these assertions are speculative." Indeed, those historic discharges are not an environmental impact of the proposed LCP amendment. But any such potential sewage overflows, the Commission continued, would "be appropriately addressed through the requisite [coastal development permit] application and analysis." We see no inadequacy in this response.

### 3.

The Commission's response to comments regarding traffic impacts is no different. Midcoast maintains the Commission did not specifically respond to certain analytical issues raised in a peer review letter from an engineering firm regarding the methodology in the preliminary traffic analysis for Cypress Point. According to the engineering firm, the analysis omits weekday trip generation estimates, is unreliable, is incomplete with regard to mitigation, and does not resolve identified significant traffic impacts. Moreover, the planned 142 parking spaces exceeds County requirements and would increase Cypress Point traffic impacts, and there are likely to be

significant adverse traffic impacts to a particular intersection resulting from Cypress Point.

The Commission noted its staff report analysis of traffic impacts relied on numerous technical traffic studies provided by both MidPen and the County, including two Cypress Point-specific traffic assessments as well as a larger community planning level assessment through the County. It acknowledged existing traffic deficiencies in the area surrounding the Moss Beach parcel, including specific intersections with Highway 1 during commute periods. But the Commission noted any future development project affected by the proposed LCP amendment must address potential traffic and circulation impacts, and the existing LCP already includes sufficient standards and requirements to ensure those impacts are analyzed and mitigated. Any future project under the amendment could only be approved *if* it addressed traffic impacts. We agree with the Commission that no specifically detailed response was required, given that it was analyzing the impacts from the proposed LCP amendment, not Cypress Point. (*Ross*, *supra*, 199 Cal.App.4th at p. 941 [indicating the Commission has no obligation to respond to public comments with a "level of specificity that would normally be carried out at a coastal development permit juncture" when it is currently in the process of approving an LCP].)

In addition, the Commission cited the County's current process of identifying potential transit and roadway improvements, such as improving pedestrian and bicycle routes between the parcel and downtown Moss Beach, improving existing bus stops, which the County intends to approve prior to any coastal development permit for a future development on the parcel. Those measures are intended to help enhance traffic flow to both existing and

planned development in the area.  Accordingly, the Commission appropriately responded to comments related to traffic impacts.

**4.**

Midcoast contends the Commission did not respond to public comments regarding biological impacts — that MidPen's analysis failed to assess whether Cypress Point would violate various federal environmental protection laws and California wetlands conservation policy because endangered species and habitats may be present on the Moss Beach parcel, the vegetation assessment performed was incomplete, and Cypress Point will likely adversely impact wetlands because it lacks any storm drain infrastructure.  This argument ignores the record.

Analyzing whether Cypress Point would violate federal Endangered Species Act of 1973, Clean Water Act, or other California conservation policies was unnecessary.  As the Commission responded, there "is no documented evidence to date that any special status species are present on the [Moss Beach parcel], either currently or historically."  It explained the absence of these species is due to the site being "exposed to on-going human presence including some vehicle and pedestrian traffic" — it is disturbed and otherwise occupied by ruderal vegetation.  Moreover, the Commission expressly responded to comments regarding Cypress Point's drainage by stating "it has been addressed by the letter provided by" MidPen's consultant, attached to the staff report addendum.  That letter explains MidPen's supplemental environmental evaluation report evaluates the potential for Cypress Point to result in hydrologic or water quality impacts to Montara Creek and the James V. Fitzgerald Area of Special Biological Significance. The report notes that Cypress Point would be required to obtain coverage under a general permit for discharges of stormwater associated with

58

construction activity.  Cypress Point, the report explained, must also be consistent with the County's municipal regional permit for stormwater and the James V. Fitzgerald Area of Special Biological Significance pollution reduction program for stormwater discharge during and after construction. Accordingly, the report rejected the public comment about discharges, noting the comment does not provide any evidence that would change this conclusion.  Referring to MidPen's responses and its analysis, all contained as an appendix to the staff report addendum, in response to the public comment was proper.  (*Long Beach*, *supra*, 176 Cal.App.4th at p. 901 [references to office of environmental health and safety memorandum and an environmental consultant's findings regarding proposed mitigation measures provided the public with sufficient detail "to comprehend and meaningfully consider the issues raised by the proposed project and the conclusions" the school district reached regarding mitigation measures].)  The Commission's responses satisfied CEQA requirements.

In our view, the Commission disclosed and carefully considered the environmental consequences of the proposed LCP amendment, explained the reasons for its approval, and afforded the public "an opportunity to participate meaningfully in the environmental review process."  (*Ballona Wetlands Land Trust v. City of Los Angeles*, *supra*, 201 Cal.App.4th at pp. 466–467.)  Thus, there is no basis to reverse the judgment.

## DISPOSITION

The judgment is affirmed.  The Commission is entitled to costs on appeal.  (Cal. Rules of Court, rule 8.278 (a).)

_____
RODRÍGUEZ, J.

WE CONCUR:


_____
FUJISAKI, Acting P. J.


_____
PETROU, J.

A168036; *Midcoast Eco v. California Coastal Commission*